# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

**MARY ANN SCOTT**                **CASE NO.  6:20-CV-00510**

**VERSUS**                        **JUDGE ROBERT R. SUMMERHAYS**

**COMMISSIONER OF SOCIAL**        **MAGISTRATE JUDGE**
**SECURITY ADMINISTRATION**       **WHITEHURST**

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

Claimant, Mary Ann Scott, fully exhausted her administrative remedies before filing this action in federal court. She filed an application for disability insurance benefits, alleging disability beginning on March 3, 2009. Her application was denied. She then requested a hearing, which was held on April 25, 2019 before Administrative Law Judge Devona Able. (Rec. Doc. 9-1, p. 40-70). The ALJ issued a decision on June 20, 2019, concluding that Claimant was not disabled within the meaning of the Social Security Act. (Rec. Doc.9-1, p. 21-30). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found

no basis for review. (Rec. Doc. 9-1, p. 7). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on October 19, 1969. She was 39 years old on the alleged disability onset date and 45 years old on the date last insured (December 31, 2014). She has a high school degree, and she attended two years of college. (Rec. Doc. 9-1, p. 48). She alleged that she has been disabled since March 3, 2009, on which date she fell down the stairs at work. (Rec. Doc. 9-1, p. 48-49). At the time, she was working for the state of Georgia at a juvenile detention facility as a warehouse supervisor. (Rec. Doc. 9-1, p. 49-51). The medical records in the record reveal the following pertinent history:

- February 2011 through March 2012 – Claimant treated with Dr. Goldware, Dr. James Domingue, and Dr. Joseph Gillespie for her neck and back pain. She was prescribed medication before being referred to Dr. Patrick A. Juneau for cervical fusion. (Rec. Doc. 9-2, p. 447-55).
- April 28, 2011 – Dr. Patrick A. Juneau performed anterior cervical discectomy with instrumented fusion at C6-7. He opined that she would reach maximum medical improvement (MMI) by February 1, 2012. (Rec. Doc. 9-2, p. 425-45).
- December 29, 2011 – Independent Medical Evaluation (IME) with Dr. L.D. Empting at Claimant's counsel's request. Claimant suffered from neck and back pain following a work-related 4-foot fall from stairs without a railing. She had a disc herniation at C6-7 and was status post anterior cervical fusion with ongoing neck pain and left arm radiation. She also had left suboccipital and shoulder myofascial syndrome with right-sided cervical facet pain, post-

2

traumatic migraines, decreased hearing of the left ear, poor balance, and diminished smell, questionable left shoulder joint pathology, ulnar neuropathy at left elbow with possible contribution at the wrist and possible lower brachial plexus and/or C7 contribution; right lumbar and right hip myofascial syndrome with some right lumbar facet findings with some A-Delta L5 radiculopathy; questionable worsened bowel and bladder incontinence; agitated, anxious, and depressed features. In an April 2012 addendum, Dr. Empting indicated, following review of additional imaging studies and records, that additional diagnostic procedures should be done. (Rec. Doc. 9-2, p. 278-300).

- July 2012 – Dr. Clark Gunderson examined Claimant for headaches, neck, and lower back pain radiating into the right buttock. Dr. Gunderson noted that she needed a new pain management doctor after being discharged from Dr. Gillespie for "non compliance." Dr. Gunderson noted her status as "no duty." (Rec. Doc. 9-2. p. 478-79).

- March 9, 2012 – cervical MRI revealing C4-5 minimal central disc bulge, otherwise negative, C5-6 minimal central disc bulge without evidence of spinal or foraminal stenosis, C6-7 anterior cervical fusion with no recurrent disc disease. (Rec. Doc. 9-2, p. 473).

- March 9, 2012 – MRI of left shoulder revealed hypertrophic osteoarthritis of the AC joint creating rotator cuff impingement and arthrosis of the joint space; degeneration of the rotator cuff with a partial tear along the articulating surface with no evidence of a full-thickness tear; and degeneration of the superior labrum. (Rec. Doc. 9-1, p. 333).

- March 12, 2012 – A nerve conduction study by Dr. Stuart Begnaud revealed findings compatible with early sensorimot or peripheral neuropathy in upper extremity, which is generally subacute to chronic rather than from a direct injury. Testing of the right lower extremity was completely normal. Dr. Begnaud could not diagnose carpal tunnel syndrome of the left upper extremity due to comparative with ulnar and radial latencies that did not exceed .6 ms total. (Rec. Doc. 9-1, p. 247).

- July through October 2012 – Claimant saw Dr. Brett Cascio for left shoulder adhesive capsulitis, left rotator cuff tear, and cervical pain. Dr. Cascio recommend left shoulder arthroscopy with lysis of adhesions, manipulation under anesthesia, and biceps tenodesis. Workers compensation did not approve the surgery. She also underwent physical therapy for her shoulder. (Rec. Doc. 9-2, p. 465-69).

- September 2012 through January 2015 – Claimant treated with Comprehensive Pain Management, Dr. Sandra Weitz, beginning in September

2012 after moving to Louisiana from Georgia for her husband's job. She reported immediate neck pain radiating into her left arm and low back pain developing over the next several months. Even after cervical fusion with Dr. Juneau, she continued with radiating arm pain and intermittent numbness and tingling in her fingers, as well as occipital headaches and left shoulder pain. She rated her pain at 10/10. Her pain was so out of control, she was having trouble coping. Dr. Weitz began a regimen of multiple medications for pain, anxiety and sleep. She was not at maximum medical improvement, and Dr. Weitz opined in September 2012 that MMI would not occur for 3-6 months. During this time period, Claimant underwent multiple cervical and lumbar epidural steroid injections. The records evidence ongoing pain with radiation and her attempts to be more active while living with the pain. (Rec. Doc. 9-2, p. 303-423).

- January 11, 2013 – Pursuant to her workers' compensation suit, Dr. Sandra Weitz referred Claimant for a pain/psychological evaluation with Dr. Charles Frey with Jefferson Neurobehavioral Group. Dr. Weitz had documented limited response to pain management and requested the evaluation to assess depression, anxiety and pain coping skills. Claimant reported a history of a "falling out" with Dr. Juneau, who performed her cervical disc surgery as well as low rapport with other physicians, including a pain management specialist and workers' compensation independent medical examiner. She reported two incidents of sexual molestation as a child but an otherwise happy childhood. She had been married at that time for 19 years with a son and daughter, who were 18 and 16 at the time. She reported a long and stable job history until the work injury. The Symptom Validity Assessment revealed "significant psychometric evidence of exaggerated physical and emotional symptoms and suffering." She had an average intelligence and working memory. The analyst opined that Claimant was "a highly psychologically complicated pain patient." While he deferred a diagnosis of malingering, he found that her physical pain and suffering were being magnified through multiple psychological factors which she was not consciously controlling. Following a detailed analysis of her history and psychological testing, Dr. Frey found that an examination of her psychological risk factors would have made her a poor surgical candidate before her cervical surgery, and that she remained a poor candidate because of those risk factors. Rather than surgery, he opined that her treatment should follow a conservative, rehabilitative functional restoration model, including rehabilitation medicine, physical therapy, and CBT. With regard to her disability status, Dr. Frey concluded that she can and should return to work in some capacity at the earliest date considered appropriate by her physicians, as this would be psychologically healthy in that

4

it would activate her behavior, reduce her level of focus on her pain, and contribute to reductions in depression, anxiety, and frustration. (Rec. Doc. 9-1, p. 254-69).

- January 31, 2013 – Dr. Charles Frey with Jefferson Neurobehavioral Group interviewed Claimant for a presurgical psychological evaluation. He determined there was a high level of psychological complication, which possibly explained disparities between her symptoms and findings of her physicians. This indicated a role for cognitive-behavioral treatment (CBT) to help restore her functioning and return to work. Dr. Frey requested that she be authorized to undergo CBT with Dr. Kirsten Schwehm. He opined that the findings indicated exaggeration, possibly internal exaggeration of symptoms and suffering. He underscored the importance of communicating symptoms and treatment response accurately so her treating doctors could help. (Rec. Doc. 9-1, p. 253).

- March 2013 through December 2016 – Claimant treated with Dr. Sandra Weitz and Dr. Kelly Boussert at Comprehensive Pain Management for "failed neck syndrome" and lumbar spondylosis. In March 2013, she was extremely agitated over Dr. Frey's psychological report and felt that she had been misrepresented. She was not interested in the CBT. As of March 2013, Dr. Weitz opined that she was at maximum medical improvement and ordered an FCE to determine her work restrictions. (Rec. Doc. 9-1, p. 393-402). Dr. Weitz continued to note sedentary capability through at least June 2015; however, by February 2016, Dr. Weitz recommended that she be evaluated by a neurosurgeon for her L4-5 large disc herniation with significant progression accounting for progressively worsening low back and leg pain and for her failed response to previously helpful ESI. (Rec. Doc. 9-2, p. 485-560. See also Rec. Doc. 9-1, p. 289-326).

- February 5, 2016 – A lumbar MRI, compared to a March 28, 2014 study, revealed new onset of minor disc bulge at L2-3, progression of a minor central disc bulge at L3-4, prominent right lateral disc herniation at L4-5not present on prior studies, development of minimal central soft tissue disc bulge at L5-S1. (Rec. Doc. 9-1, p. 327-28).

- March 22, 2016 – Dr. Clark Gunderson sent her to neurosurgeon after reviewing her MRI for herniated disc at L4-5. He noted her status as "no duty." (Rec. Doc. 9-2, p. 472-83).

- June 2, 2016 – Dr. Richard Stanger at the NeuroMedical Center Clinic performed right L4-5 laminotomy, foraminotomy, and microdiscectomy with removal of synovial cyst. (Rec. Doc. 9-1, p. 499).

- April 2016 through October 2016 – Claimant saw Dr. Stanger before and after her June 2016 lumbar surgery. Dr. Stranger opined that she would benefit from a minimally invasive discectomy at L4-5 due to a large right disc herniation. He did not see the need for anything more invasive. In August 2016, he referred her for cervical and lumbar CT myleograms and additional radiology. Her physical exams showed 4/5 weakness in the right lower extremity and at times weakness in the left arm, as well as paresthesis to the right lower extremity. (Rec. Doc. 9-1, p. 363-90).

- October 2016 – A cervical CT myleogram showed the previous anterior fusion at C6-7, spondylosis at multiple levels with some cord flattening ventrally, no evidence of soft disc extrusion or cord signal alteration. There was foraminal narrowing and facet change and decrease in craniocervical angle. (Rec. Doc. 9-1, p. 355). A lumbar CT myelogram showed transitional segment at S1 with bilateral lumbarization. There was a recurrent protrusion/extrusion centrally and laterally to the right of the transitional foramen and compromise of the exiting right S1 root and possibly the lateral extent of the right L5 root. There was mild degenerative disc disease at other levels associated with spondylosis, facet change, and some thickening of the ligamenta flava. (Rec. Doc. 9-1, p. 357).

- December 8, 2016 – Following the foregoing studies, Dr. Stanger noted that the cervical fusion had not had complete bone growth and she had significant degenerative changes in her cervical spine. He scheduled her for an EMG in order to pinpoint the cause of her symptoms of radiating pain and numbness. (Rec. Doc. 9-1, p. 528-35).

- January 10, 2017 – Dr. Stanger reviewed her abnormal EMG study, which showed evidence of bilateral ulnar sensory neuropathies, but no evidence of either cervical or lumbosacral polyradiculopathy. The physical exam showed 4/5 strength in the right lower extremity with pain limitation and weakness of the left arm, as well as paresthesias to right lower extremity and parethesias numbness in both hands. He recommended a cervical ESI in light of her incomplete fusion from her previous cervical fusion. His recommendation was noncommittal as to a second cervical surgery. (Rec. Doc. 9-1, p. 417-36).

- She underwent the recommended CESI in February 2017 with Dr. Boussert. She reported 50% reduction in neck pain thereafter. (Rec. Doc. 9-1, p. 478; 487).

- March 21, 2017 – Claimant followed up with Dr. Stanger, who noted that the cervical ESI had been helpful, though she still had some numbness in the fingertips. Then the pain returned and was worse. Given the amount of degenerative changes in her neck, Dr. Stanger recommended she consider

another cervical surgery, ACDF at C3-4, 4-5, and 5-6 with removal of the hardware at C6-7 and evaluation of arthrodesis. She had a lot of generalized weakness and loss of function over the years. (Rec. Doc. 9-1, p. 509-15).

- March 21, 2017 Residual Functional Capacity Questionnaire by Dr. Stanger – Dr. Stanger indicated her diagnoses were status post L4-5 microdiscectomy and removal of synovial cyst; L5-S1 nerve root compression; multi-level lumbar degenerative disc with spondylosis; multi-level cervical degenerative disc disease with spondylosis and cord flattening at C3-4 and C5-6 and C6. Her prognosis was guarded. According to Dr. Stanger, she was not a malingerer. She suffered from right leg pain and numbness, lumbar spine pain, neck pain, and bilateral upper extremity pain and numbness. Objective findings included reduced range of motion, positive straight leg raising test, sensory loss, tenderness, swelling, and muscle weakness. Emotional factors contributed to her symptoms and functional limitations. Physical limitations included sitting for 45 minutes before needing to stand and standing for 10 minutes before needing to sit. During an 8 hour work day, she could stand/walk for less than 2 hours and sit for about 4 hours. She would need 10-15 minute breaks every 2-3 hours. She could rarely lift less than 10 pounds and rarely climb stairs. She also had significant limitations for reaching, handling, or fingering. Dr. Stanger summarized that her lumbar symptoms had worsened since her injury. The June 2016 surgery revealed a calcified cyst which had been there for some time, that had not been visible in the MRI films, and that was compressing the nerve root. She continued with nerve root compression at S1 thereafter, suffering from right lower extremity pain and numbness which caused her to fall. She continued with neck pain radiating in her arms, as well as ulnar neuropathy in the left arm with Tinels' at the elbow. She had an incomplete fusion at C6-7 and disc herniations and foraminal narrowing at the above levels. (Rec. Doc. 9-1, p. 437-41). Subsequent records from Comprehensive Pain Management indicate that Dr. Stanger had recommended cervical spine surgery. (Rec. Doc. 9-1, p. 493).

- August 1, 2017 follow up with Dr. Stanger – She complained of greater neck pain and radiation into her left arm and numbness and paresthesias into her bilateral hands, as well as lower back pain down to her right leg and numbness. This caused her trouble doing daily activities. The physical exam showed 4/5 strength with limiting pain, paresthesias to the right lower extremity, and left forearm decrease sensation down into the hand. She had trouble standing or walking for short periods because of the pain. She had pain with bending over. She also had pain in her shoulder. Dr. Stanger deferred any recommendations for her shoulder. (Rec. Doc. 9-1, p. 552-57).

- August 25, 2017 – At the request of Claimant's counsel at the time, Dr. L.D. Empting did an updated IME chart review as part of Claimant's workers' compensation case in Georgia. Following review of the updated records, Dr. Empting opined this was a fairly straightforward trauma-induced natural history of an L4-5 discogenic problem that initiated with the March 2009 fall. Ultimately, she had a traumatically-induced internal disc disruption, some disc protrusion that worsened over time to the point that surgery was required in June 2016, and a superimposed traumatically-induced synovial cyst. The odds were fairly good that she would have further progression of the L4-5 and would eventually require an interbody fusion. Dr. Stanger concluded that her injuries from the fall would easily put her into a catastrophic category. (Rec. Doc. 9-1, p. 562-65).

- June through September 2017 – Claimant continued to follow up with Dr. Boussert and eventually underwent a caudal epidural steroid injection. (Rec. Doc. 9-1, p. 566-77).

- October 26, 2017 – Dr. Boussert's Residual Functional Capacity – Her prognosis was noted as guarded with functional improvement not expected. She was not a malingerer. Dr. Broussert's explanation of Claimant's symptoms and complaints and her physical limitations mirrored those of Dr. Stanger's previous RFC Questionnaire, except that Dr. Broussert opined that she could occasionally left less than 10 pounds. He concluded that her condition, functional impairments and physical limitations have waxed and waned between less than sedentary and sedentary, improving at times with ESIs, medication, rest, and inactivity. Her symptoms quickly degenerate, and she had experienced multiple falls due to her leg giving way. Despite treatment and medication, her pain had not improved. (Rec. Doc. 9-1, p. 586-90).

- October 27, 2017 – Outpatient consultation/high complexity consultation with Dr. L.D. Empting at the referral of Dr. Stanger. After reviewing the October 2016 myelogram CT of her cervical spine, he noted that the hardware was solid, though there was some lucency in the bone. With regard to the lumbar spine, Dr. Empting agreed that she was worse following lumbar surgery. She had worsened S1 radiculopathy and numbing paresthesias which caused the falls. Following a detailed analysis of her complicated situation, he opined that an interbody fusion at L4-5 would be an ideal solution. He noted that she would not spontaneously get any better or more functional. He concluded in summary that she had a bad disc situation at L4-5 when he first saw her in 2011 and that it got worse over the years with worsened radiculopathy and decompression of the L4-5 disc, with worsened radiculopathy, arachnoiditis, and nociceptive facet and discogenic pain. She would require long-term

vigorous pain service medication maintenance with an increased emphasis on anti-neuropathic co-pharmacy. (Rec. Doc. 9-2, p. 572-76).

- October 27, 2017 – RFC Questionnaire from Dr. Empting (Claimant's IME for her workers' compensation case) indicated that her prognosis was guarded "at best." His assessment was similar to those of Dr. Stanger and Dr. Boussert, except that he opined she could rarely lift less than 5 pounds and could never climb stairs. In addition, he noted that she should be using a cane. He concluded with a statement that, "She is totally, permanently disabled." (Rec. Doc. 9-1, p. 591-95).

- November 9, 2017 – Follow up with Dr. Stanger – Claimant reported continued complaints of neck and lower back pain as well as numbness and paresthesias into the bilateral hands. They were still waiting on workers' compensation approval for the revisionary cervical surgery. Her depression was getting worse. (Rec. Doc. 9-2, p. 58-64).

- December 21, 2017 – Follow up with Dr. Stanger and Claimant's case manager – Her complaints remained the same, and her ability to perform activities of daily living were decreasing as time went on. Dr. Stanger provided a letter indicating that due to the severity of her painful symptoms, he recommended 4-5 hours a day of family care as medically necessary to assist with her needs at home. Dr. Stanger still believed a revisionary cervical surgery to be a reasonable option. He did not know what else could be done, as she had failed with all other treatments. He encouraged her to be as active as she could be, but otherwise he stated that she should continue to follow up. (Rec. Doc. 9-2, p. 50-58).

- March 22, 2018 – Follow up with Dr. Stanger – Worker's compensation had denied her request for ACDF. She reported her handwriting was changing due to her hands being irritated and numb. She continued to complain of numbness, as well as daily migraines. They decided to instead try a selective nerve root block at C7, which was done in April 2018 with Dr. Samir Patel. (Rec. Doc. 9-2, p. 40- 43).

- May 4, 2018 – IME by Dr. William Brennan for the workers compensation case. After reviewing her medical history (summarizing records which are not in the record), his physical examination showed a "frozen neck" with only 5% normal range of motion in all directions and positive straight leg findings on the right, positive Tinel's at the left elbow and diminished sensation in the 4th and 5th fingers of the left hand with hypersensitive lateral portion of her right leg to sensory examination. Dr. Brennan opined that the medical care for her cervical disc herniation and left upper extremity injury were appropriate. He did not believe the L4-5 pathology was related to the work injury, because the

March 2012 MRI did not show the pathology, among other reasons. He did not believe any further cervical surgery was necessary – only continued pain medication. (Rec. Doc. 9-2, p. 578-84).

- September 6, 2018 – Lumbar MRI revealed stable central broad-based disc bulge; stenosis of the lateral recesses at L4-5 with recurrent disc herniation versus residual extruded disc material and most likely compromise of the L5 nerve roots; significant facet joint arthrosis at L5-S1. (Rec. Doc. 9-2, p. 19-20).

- May 2018 through February 2019 – Claimant followed up with Dr. Stanger, Dr. Boussert (who performed several injections, each with temporary relief), and Dr. Samir Patel (pain management). During that time, Dr. Stanger recommended a revision cervical fusion which would include two screws, an adjustable bed, and modified bath tub. (Rec. Doc. 9-2, p. 22-40; 143). He also found she had a lot of narrowing around the nerve openings bilaterally at L4-5. If the ESI's failed, he would recommend a L4-5 TLIF surgery to decompress and stabilize the spinal nerves. She reported that it was difficult to write, and she dropped things. She exhibited decreased strength and numbness to lateral portion of bilateral lower extremities with decreased sensations to ulnar surfaces. (Rec. Doc. 9-2, p. 3-18; 67-209).

- March 20, 2019 – Updated FCE Questionnaire from Dr. Boussert – Recommendations remained the same, with additional notes that the most recent ESI's had not helped as well as in the past or lasted as long. (Rec. Doc. 9-2, p. 213-17).

- March 21, 2019 – Updated FCE Questionnaire from Dr. Stanger – Recommendations from her prior 2017 FCE remained the same. (Rec. Doc. 9-2, p. 218).

- January through April 2019 – Jody Loper Rehabilitation. Ms. Loper provided support pursuant to the workers compensation file. Claimant expressed willingness to move forward with psychiatric services. Ms. Loper concluded the recommended surgeries, adjustable bed, bath modification, and home care services were all appropriate. (Rec. Doc. 9-2, p. 227-68).

Claimant testified at the hearing that she does not drive, because she is scared to due to her medications. (Rec. Doc. 9-1, p. 48). She resides with her husband and adult daughter who care for her and handle the household chores. (Rec. Doc. 9-1, p. 57-58). She testified that she cannot turn her head without excruciating pain shooting

into her shoulder and arms, and that her fingertips are numb with loss of sensation. She frequently falls. (Rec. Doc. 9-1, p. 60). She has also suffered from depression, for which she was prescribed citalopram and buspar. (Rec. Doc. 9-1, p. 63).

The ALJ determined that Claimant was insured for purposes of disability insurance through December 31, 2014 ("date last insured" or "DLI"). (Rec. Doc. 9-1, p. 21). The ALJ nonetheless found that, although Claimant suffered from several severe impairments, she was not disabled on the DLI, because she was capable of performing sedentary work subject to certain physical limitations at that time. (Rec. Doc. 9-1, p. 23-30). Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.   Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

## B.   Entitlement to Benefits

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a).  See also *Smith v.*

*Berryhill*, 139 S.Ct. 1865, 1772 (2019). A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

## C.   **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still

do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.**    **The ALJ's Findings and Conclusions**

The ALJ determined at step one that Claimant did not engage in substantial gainful activity between the alleged onset date, March 3, 2009, and the DLI, December 31, 2014. (Rec. Doc. 9-1, p. 23). This finding is supported by substantial evidence in the record. Claimant does not challenge December 31, 2014 as the DLI.

At step two, the ALJ found that Claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spines, adhesive capsulitis of the left shoulder, and obesity. (Rec. Doc. 9-1, p. 23). This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 9-1, p. 24). Claimant does not challenge this finding.

With regard to Claimant's RFC, the ALJ found that on the DLI, Claimant was capable of performing sedentary work, except for no more than occasional stooping, kneeling, crouching, crawling, balancing and climbing ramps/stairs, no climbing ladders, ropes or scaffolds, and the need to change position for 1-2 minutes per hour without being off task or away from the workstation. (Rec. Doc. 9-1, p. 25). Claimant challenges this finding.

At step four, the ALJ found Claimant was unable to perform past relevant work. (Rec. Doc. 9-1, p. 28). Claimant does not challenge this finding.

At step five, the ALJ found Claimant was capable of performing certain jobs which existed in significant numbers in the national economy. (Rec. Doc. 9-1, p. 29). Claimant challenges this finding to the extent she challenges the ALJ's RFC finding.

**E.      The Allegations of Error**

Claimant alleges the ALJ erred by 1) failing to consider critical evidence, resulting in findings not based on substantial evidence; 2) failing to award even a closed period of disability; and 3) determining that Claimant was capable of performing sedentary work. Allegations of Error 1 and 3 are considered pursuant to review of the ALJ's RFC finding.

**F.      Whether the ALJ's RFC is supported by substantial evidence.**

The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations. "The regulations require the ALJ to determine residual functional capacity by considering all of the relevant evidence and addressing the claimant's exertional and non-exertional limitations." *Irby v. Barnhart*, 180 Fed. App'x 491, 493 (5th Cir. 2006) (citing 20 C.F.R. §§404.1545, 419.945; SSR 96-8p).

In determining Claimant's RFC on the DLI, the ALJ found the objective medical evidence did not comport with Claimant's allegations. (Rec. Doc. 9-1, p. 25). With regard to Claimant's cervical spine, the ALJ specifically relied on medical records showing that she underwent fusion surgery at C6-7 in April 2011, that she did not comply with post-operative pain management (Rec. Doc. 9-2, p. 479), that the March 2012 post-surgery MRI showed "only minimal abnormalities" (Rec. Doc. 9-2, p. 473), and that Dr. Weitz released Claimant to sedentary work in 2013 following an FCE (Rec. Doc. 9-1, p. 379-81;). (Rec. Doc. 9-1, p. 25).

With regard to Claimant's lumbar spine, the ALJ relied on medical records showing that Dr. Weitz had released Claimant to sedentary work in 2013, that lower back complaints did not appear until 2012 (Rec. Doc. 9-2, p. 303 *et seq*), and that lumbar injections provided her relief until the time at which she underwent lumbar surgery in June 2016 (after the DLI). (Rec. Doc. 9-1, p. 26).

Claimant contends the ALJ ignored the following critical evidence:

- Operative report from Claimant's June 2016 surgery, L4-5 laminotomy, foraminotomy, and microdiscectomy with removal of synovial cyst. (Rec. Doc. 9-1, p. 499)
- Dr. Stanger's March 21, 2017 FCE indicating significant physical limitations due to the incomplete cervical fusion, lumbar nerve root compression, and radiating neck and leg pain. (Rec. Doc. 9-1, p. 493)
- Dr. Empting's August 25, 2017 chart, records, and film review report indicating that her lumbar problems were caused by the 2009 work accident and that they had progressively worsened over time leading to the need for surgery. (Rec. Doc. 9-1, p. 562-65),

- Dr. Broussert's October 26, 2017 FCE report and Dr. Empting's October 27, 2017 FCE report which mirrored Dr. Stanger's FCE findings.
- 2019 records from Jody Loper Rehabilitation indicating that the recommended cervical and lumbar surgeries, adjustable bed and bath modifications, and home care services were all appropriate in light of Claimant's conditions. (Rec. Doc. 9-2, p. 227-68).

The Court interprets Claimant's alleged errors in this regard as a challenge to the ALJ's assignment of weight to physicians. In other words, Claimant contends the ALJ failed to give due weight to the foregoing opinions of her treating physicians in determining her RFC. The Social Security regulations and rulings explain how medical opinions are to be weighed. 20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p. Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. In this case, the claimant's application is governed by the "treating source rule," which provides that a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d at 176.  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so. *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).  Good cause may be shown if the treating physician's opinion is conclusory,

18

unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence. *Id.*

The Court agrees that the ALJ failed to consider critical evidence and improperly weighed Claimant's treating physicians' opinions, such that the ruling is not supported by substantial evidence. The extensive medical records support that Claimant suffered a C6-7 herniation which required a fusion in April 2011, and that Claimant's treating physician, Dr. Weitz, did not consider that Claimant had reached MMI and could return to a sedentary job until at least June 2013. (Rec. Doc. 9-2, p. 379-81). There is no evidence in the record which contradicts Dr. Weitz's opinions. Instead, the ALJ relied on a single handwritten notation from Dr. Gunderson, who saw Claimant once in 2012, that she had been discharged from a prior pain management doctor due to non-compliance. This ignores the ample evidence of Claimant's ongoing treatment with Dr. Weitz, Dr. Broussert, and Dr. Cascio beginning in 2012, as well as her treatment with Dr. Stanger, beginning in 2016, which relates her issues to the 2009 incident. The ALJ also relied upon her own opinion that the March 2012 cervical MRI revealed "only minimal abnormalities." "Although the ALJ may weigh competing medical opinions about…limitations and use objective medical evidence to support its determination that one opinion is better founded than another, neither the ALJ nor the court is free to substitute its own opinion." *Fabre v. Astrue*, No. 13-00076-BAJ-RLB, 2014 WL 4386424, at *6 n. 6

(M.D. La. Sept. 4, 2014). The ALJ's opinion in this regard ignores subsequent records indicating that the fusion was, in fact, incomplete. (Rec. Doc. 9-1, p. 528-35; 9-2, p. 3-10). The ALJ also relied upon records indicating that several ESI's provided relief; however, the records are clear that any relief from the ESI's was temporary and the recurring pain ultimately led to surgery. (See e.g. 9-2, p. 303-423.) The record is replete with records indicating that between the neck surgery (April 2011) and DLI (December 31, 2014), Claimant suffered from ongoing neck pain with radiation into her hands, which caused functional limitations. See especially Dr. Weitz's September 2012 through January 2015 treatment records at Rec. Doc. 0-2, p. 303-423.

The Court also agrees that the ALJ failed to consider the ample evidence in the record from Claimant's treating physicians that Claimant suffered from a low back injury commencing in 2009, with increased complications manifesting by at least 2012 and digressing to the point that surgery was required in 2016. Post-DLI records are relevant because they reveal that the cause of Claimant's lumbar nerve root impingement, a synovial cyst, was not visible on any of the imaging studies and did not become apparent until the 2016 surgery, though the cyst had likely originated with the 2009 accident. Although Claimant's back pain may not have been debilitating immediately following the incident, the records support that her low back issues progressively worsened over time to the point that these possibly became

debilitating prior to the DLI, especially when considered in conjunction with her neck issues. (See e.g. Rec. Doc. 9-2, p. 303-423.)

The Court finds that the ALJ failed to give due weight to opinions of Claimant's treating physicians, Dr. Weitz, Dr. Stanger, and Dr. Boussert. Accordingly, the Court finds that the ALJ's decision is not supported by substantial evidence in the record. Rather, the case should be remanded with the instruction for the ALJ to give proper weight to Dr. Weitz's, Dr. Stanger's and Dr. Boussert's opinions.

Claimant further relies upon Dr. Stanger's, Dr. Boussert's, and Dr. Empting's 2017 FCE reports indicating that Claimant is incapable of performing any work; however, these reports would not necessarily reflect Claimant's functional capacity on December 31, 2014. Nonetheless, the ALJ should consider these physicians' opinions to the extent they shed light upon the limitations caused by the cyst, which was related to the 2009 incident but the existence of which was not discovered until the 2016 surgery.

The ALJ also considered Claimant's shoulder complaints and obesity in determining her RFC and functional limitations; however, Claimant did not challenge the findings in this regard.

### G.    <u>Whether the ALJ should have awarded a closed period of disability.</u>

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to show she is entitled to disability benefits, the claimant must not only prove that she is disabled, but that she became disabled prior to the expiration of her insured status. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The Court agrees that the ALJ failed to consider any closed period of disability. The unrefuted records from Dr. Weitz show that Claimant was not released for sedentary work until at least 2013. Accordingly, Claimant is entitled to at least some period of disability commencing, at the latest, in April 2011 when she underwent cervical fusion, and possibly earlier depending upon consideration of Claimant's pre-surgery functionality. Therefore, the case should be remanded for consideration of a closed period of disability in light of the medical evidence.

### <u>Conclusion and Recommendation</u>

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to reevaluate Claimant's

RFC on the date last insured based upon Dr. Weitz's, Dr. Stanger's, and Dr. Boussert's opinions and, if necessary thereafter, to assess, at a minimum, a closed period of disability. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

---

[1]      See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

Signed in Lafayette, Louisiana, this 8th day of March, 2021.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE

---

[2]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).